## 41840. GEORGIA STATE FINANCING & INVESTMENT COMMISSION v. STATE OF GEORGIA et al.
(325 SE2d 162)

WELTNER, Justice.

The state sought validation of general obligation bonds to be issued by the Georgia State Financing and Investment Commission for construction and improvement of water and sewage treatment facili-

ties, which are to be owned by the Georgia Development Authority and leased by it to local governments. On motion of an intervenor, validation was denied. The state and the commission appeal.

Whether additional facilities are needed is not at issue; nor are the advantages of general obligation bond financing. The only question before us is the breadth of the constitutional limitation placed by the people of Georgia upon general obligation debt of the state, as contracted in behalf of state authorities, and whether the proposed debt here challenged falls within — or without — that limitation.

The constitutional prohibition arises as the implied antithesis of the constitutional power. "The state may incur . . . General obligation debt to acquire, construct, develop, extend, enlarge, or improve land, waters, property, highways, buildings, structures, equipment, or facilities of . . . those state authorities which were created and activated prior to November 8, 1960." Constitution of Georgia of 1983, Art. VII, Sec. IV, Par. I (c). The obverse of that power is that the state may *not* incur general obligation debt for those same purposes in behalf of state authorities which were created and activated on or after November 8, 1960.

The state and the commission contend that general obligation bond financing is available for the construction or improvement of water and sewage treatment facilities because the Georgia Development Authority was created and activated before November 8, 1960; that the facilities are to be the property of the authority, although leased to local governments; and that the commission and the authority were empowered expressly to undertake these activities by 1983 enactments. Ga. L. 1983, pp. 1024, 1026.

The intervenor contends that the powers conferred by the 1983 Act were not germane to the authority's powers as they existed before November 8, 1960, and that the state may not incur general obligation debt for these new purposes.

The trial court determined that the people of Georgia "intended to achieve a substantial limitation" upon the issuance of state general obligation debt, observing that the Constitution "would be meaningless, if it is construed simply to limit the issuance of debt for authorities existing in form on November 8, 1960. That is true because the General Assembly by statute could render such a limitation meaningless by attaching to those forms any power it desired, regardless of how little resemblance that power had to those 'created and activated prior to November 8, 1960.' "

1. We adopt the reasoning of the trial court. The proper approach is not a mere determination of the date of the authority's creation, but whether the authority's new powers — bestowed after the critical date — are germane to the powers it possessed before that date. See *Weeks v. Ga. State Hwy. Auth.*, 217 Ga. 14 (120 SE2d 620) (1961).

We should look to whether these new powers have "a mutual connection with" and "are not foreign to" the earlier powers. See 217 Ga. at 18.

2. The state and the commission emphasize the broad statements of public purpose found in the authorization acts of the Georgia Development Authority. Again, we agree with the trial court that these fond hopes must be anchored to the specific delineaments of powers granted by the legislature. Otherwise, almost any worthwhile activity on the part of the authority might be "germane" to its charter, and financed by general obligation debt.

3. The authority's predecessor was created on March 2, 1953, as the "Livestock Development Authority," for the general purpose of strengthening "the economic security of the State." The power of that authority was to make loans to farmers relating to stock farming and egg production. Ga. L. 1953 (Jan.-Feb. Sess.), pp. 337, 338. Later in 1953, this authority was merged with the "Georgia Rural Rehabilitation Corporation," to create a new "Georgia Livestock Development Authority," which acquired the powers of both of its predecessors. Ga. L. 1953 (Nov.-Dec. Sess.), p. 471. In 1957, the General Assembly renamed this entity the "Georgia Agricultural Development Authority" and declared that its purposes would include the general development of agriculture in Georgia. Ga. L. 1957, pp. 210, 211. On March 7, 1960, the General Assembly changed the name to the "Georgia Development Authority," and granted to it the authority to administer certain federal funds and the power of "providing or securing or guaranteeing loans" for farmers and businessmen for the purposes of "development of agriculture and industry generally within the State of Georgia." Ga. L. 1960, pp. 764, 765-66. In 1983, the General Assembly empowered the Georgia Development Authority to finance or otherwise provide environmental facilities for counties, municipalities and other political subdivisions. Ga. L. 1983, p. 1026.

The state and the commission argue that by no later than March 7, 1960, the authority had broad powers to lend money to private agricultural and industrial enterprises, which could have included loans for the construction of privately-owned water and sewage treatment facilities. They contend that the 1983 Act authorizing it to assist with the financing of water treatment facilities, which it would own and lease to local governments, was germane to the earlier general purpose of expanding industrial development. They suggest that the distinction between private and governmental ownership of the facilities is without legal consequence.

4. The only powers of the authority prior to 1983 were to provide, secure, or guarantee loans to privately-owned, for-profit enterprises, and to administer certain federal funds. The power to assist local governments through financing the construction and improvement of

publicly-owned, not-for-profit water and sewage treatment facilities was first granted to the authority in 1983.

This is a difference of watershed proportion, which we view as a quantum alteration of course. It is a substantive entry into unfamiliar areas of economic activity, and embodies the assumption of new financial risks.

We conclude that the powers sought to be conferred in 1983 were "foreign to" and lacked "mutual connection with" the powers of the authority prior to November 8, 1960. *Weeks*, supra at 18. Accordingly, as the new powers are not germane to the old powers, the judgment of the trial court must be affirmed.

*Judgment affirmed. All the Justices concur, except Gregory, J., who dissents.*

DECIDED JANUARY 31, 1985.

*Kilpatrick & Cody, A. Stephens Clay, Mara McRae, Michael J. Bowers, Attorney General, Verley J. Spivey, Senior Assistant Attorney General,* for appellant.

*Lewis R. Slaton, District Attorney, Timothy J. Sweeney,* for appellees.

GREGORY, Justice, dissenting.

The record reflects that 350 cities and counties representing 71 percent of the population of Georgia must construct or expand environmental facilities which will cost almost two billion dollars by 1992 in order to meet federal and state environmental standards. Most of these are small communities which, without financial assistance, will have great difficulty funding the necessary improvements. The economic impact of an inability to provide necessary facilities to industry and agriculture is obvious. The 1983 amendment was designed ". . . to provide environmental facilities, to assist local governments in constructing, extending, rehabilitating, repairing and redoing environmental facilities, and to assist in the financing of such needs by providing grants, loans, bonds, and other assistance to local governments." OCGA § 50-10-2 (d). All of this is for the purpose of meeting ". . . public health and environmental standards and to aid the development of trade, commerce, industry, agriculture, and employment opportunities." OCGA § 50-10-4 (10).

Telescoping the history of the Georgia Development Authority from its beginning in Georgia Laws 1953, page 337 to the last change prior to the critical date of November 8, 1960, it can be seen that its purpose is to "assist agriculture and industrial interests in their effort to commence, expand, or diversify their operations." This is done pri-

marily by providing financial support. Ga. L. 1960, p. 765. No doubt the Authority had power prior to November 8, 1960 to make loans to industries in order that they might construct their own private watershed treatment facilities or other environmental facilities. So, to illustrate the issue, we ask if the power given in the 1983 amendment to make loans to local governments to assist in constructing environmental facilities is germane to the pre-November 8, 1960 power to make loans to industry for the same purpose? I conclude that it is.

The Oxford English Dictionary, Oxford University Press 1971, defines germane: "Closely connected; appropriate; relevant; pertinent." In *Weeks v. Ga. State Hwy. Auth.*, 217 Ga. 14 (120 SE2d 620) (1961), we said in order to determine what matter is germane to the original powers we looked to the subject of the original. That is, consider what forms the "ground work" of the original. Then ask if the new is "related directly or indirectly to the main subject and [has] a mutual connection. . . ." The ground work of the original in our case was to "strengthen the economic security of the state." Ga. L. 1953, p. 338. This was accomplished through providing financial assistance to, first agriculture then industry. As I see it, the loaning of money to local governments to provide facilities which in turn assist agriculture and industry to the end of strengthening the economic security of the state is closely connected to loaning money directly to agriculture and industry to strengthen the economic security of this state. If so, the powers in the 1983 amendment are germane to the powers of the pre-November 8, 1960 Georgia Development Authority.

I would reverse.